# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**BOLACK MINERALS COMPANY**

    **Plaintiff,**

       **v.**

**GALE A. NORTON,** *Secretary of the*
*United States Department of the Interior*

    **Defendant.**

**Civil Action No.  04-738 (JDB)**

## MEMORANDUM OPINION

This case involves the status of a right-of-way to operate a communications site in

Farmington, New Mexico, and the disposition of the land underlying the right-of-way.  The

United States issued the right-of-way to a radio station in 1981.  At the time, the United States

owned the land surrounding and underlying the right-of-way.  Shortly thereafter, the United States

issued a land patent to plaintiff Bolack Minerals Company for a large plot of its land in

Farmington, "excepting and reserving from the patent" the right-of-way.  The company operating

the radio station went bankrupt soon thereafter, and the rental money owed to the government for

the right-of-way went unpaid for many years.

Almost two decades later, Dan Bradshaw -- the owner of a paging company that is

operating on the right-of-way site -- filed an application with the Bureau of Land Management

("BLM") to renew the right-of-way in his name.  The BLM rejected that application, concluding

that the right-of-way had long since expired for non-payment of rent.  Bradshaw then filed an

application to obtain a new right-of-way for the same communications site.  The BLM rejected

that application as well, holding that when the right-of-way expired, it had merged into the

underlying fee simple estate owned by Bolack.  Bradshaw took an appeal to the Interior Board of

Land Appeals ("IBLA"), and Bolack intervened before the IBLA to defend the BLM decision.

The IBLA reversed the BLM's decision, concluding that the 1981 right-of-way was still in

existence, and that the United States had reserved title to the land underlying the right-of-way

when it initially issued the land patent to Bolack.  The dispute has now made its way to this Court,

with Bolack filing a Complaint against the Department of Interior seeking review of the IBLA

opinion under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  The parties have fully

briefed cross-motions for summary judgment.  For the reasons explained below, the Court

concludes that the IBLA decision was not arbitrary and capricious under the APA, and therefore

enters judgment in favor of the Department of Interior.

## BACKGROUND

On February 23, 1981, the BLM issued to E. Boyd Whitney a right-of-way to operate a

communications site on land owned by the federal government in Farmington, New Mexico.  AR

192.[1]  The right-of-way was given serial number NM 43307.  AR 192.  The decision granting the

right-of-way provides that its "permitted use" was the operation of a commercial FM broadcast

station with call letters KRAZ-FM.  AR 192.  The "expiration date" of the right-of-way was "[t]o

coincide with expiration of FCC license."  AR 192.  The right-of-way grant also contains several

"Terms and Conditions," among them that the grant is "conditioned upon the presentation of the

license granted by the Federal Communications Commission for the installation"; that

"administrative costs and/or rentals" shall be "paid upon request"; and that the "right-of-way will

---

[1]  Citations to the Administrative Record are in the form "AR ___."

be terminated in its entirety upon written notice from this office to the grantee; or its successor or assigns, if there has been failure to file the required FCC license within 90 days from date of this grant."  AR 192-93.

On April 19, 1982, the United States issued a land patent to Tom Bolack conveying 6545.55 acres of land in Farmington, New Mexico.  AR 37-38.  The plot of land conveyed to Mr. Bolack encompassed the right-of-way.  The terms of the patent expressly "except[ed] and reserv[ed]" to the United States "[t]hose rights-of-way and easements that have been granted and which are of record as follows," listing several rights-of-way by serial number, including NM 43307.  AR 37-38.  The patent also states that the land was "conveyed subject to" a provision advising Bolack that the patented land lies in a floodplain and that he is therefore barred by executive order from seeking compensation from the United States in the event the land is damaged by floods.  AR 38.  Some time after receiving the land patent from the United States, Tom Bolack conveyed the patented land to Bolack Minerals Company, the plaintiff in this case.  Pl.'s Resp. to Def. Statement of Material Facts at 2.

On December 13, 1982, Whitney "d/b/a KRZE/KRAZ Radio Stations" filed a petition for bankruptcy protection.  AR 50-51.  On June 26, 1984, the BLM sent a certified letter to Whitney stating that a current FCC license was required for the right-of-way, and that it must be received within 30 days of receipt of the letter.  AR 34.  Within the thirty-day period, Whitney submitted an FCC license renewal authorization to the BLM.  AR 712-14.  This license renewal that Whitney sent to the BLM was granted on January 6, 1983, for a term expiring on October 1, 1983, but it also indicated that "operation beyond the license expiration date [was] authorized pending final determination" of a license application pending before the FCC.  AR 712-14.

While all of this was occurring, the BLM had not yet determined the fair market value of the right-of-way grant for purposes of calculating the rent owed by Whitney for the right to use the communications site.  In September 1984, the BLM finally approved an appraisal assessing the value of the land, and on October 15, 1984, the agency contacted Whitney to inform him that he owed four years' rental plus administrative charges.  AR 693, 39.  On November 9, 1984, Whitney requested reconsideration of the rental charges.  AR 692.  On January 28, 1985, the BLM wrote Whitney informing him that he now owed rent and costs only for the two-and-a half year period from February 23, 1981 (the date the right-of-way was granted) through October 1, 1983, on the theory that the right-of-way had expired along with the FCC license on that date.  The letter stated that if payment was not received within 30 days, the account would be "referred to [BLM's] Solicitor for legal action."  AR 41.  Whitney never paid the assessed rent, and the record does not indicate that the BLM ever contacted Whitney again or took any action regarding the overdue rental charges.

The radio station property at the communications site was passed around in a series of transactions that eventually left the ownership of the property in a state of some doubt.  On December 4, 1984, the bankruptcy court entered an order selling Whitney's station licenses, the real property relating to the radio stations, transmitters, transmitter sites (including easements), and other personal property to a bank.  AR 521-22.  The bank then sold the assets to an individual named Homer Pirkey.  Pirkey operated the radio station until October 1, 1990, at which point he claims (and Dan Bradshaw agrees) that he sold the transmitter building and the transmitter tower on the right-of-way site to Dan Bradshaw, who began operating a paging company and two-way radio company on the site.  AR 339, 523.  Nonetheless, the record seems also to indicate that

Bradshaw began leasing the communications site from Bolack in 1994.  AR 216-53.

In 1998, Bradshaw began exploring the possibility of obtaining a right-of-way grant to the land directly from the BLM.  Bradshaw visited the BLM office in June 1999, where a realty specialist retrieved the patent and "found that the [NM 43307 right-of-way] was reserved to the U.S."  161 IBLA at 122.  After consulting with legal counsel at the BLM, the specialist determined that although "[n]o money for this [right-of-way] was ever received due to bankruptcy," the right-of-way "was reserved to the BLM" in the land patent, and therefore the right-of-way "was still BLM's."  AR 47-48.

On June 16, 1999, Bradshaw filed a formal application to renew the NM 43307 right-of-way for a period of twenty years.  AR 143-44.  The BLM denied Bradshaw's application in a decision dated July 30, 1999.  The decision explained that according to the FCC license renewal that Whitney had submitted in 1984, the FCC license was set to expire on October 1, 1983.  The decision observed that Whitney never submitted evidence of another FCC license renewal, and added that no rent or administrative charges were ever paid for the right-of-way before Whitney filed for bankruptcy in 1982.  The decision concluded that "this right-of-way expired October 1, 1983 for failure to submit a current FCC license before bankruptcy was filed," and thus "the request to renew this authorization is denied."  AR 43.

However, the decision went on to inform Bradshaw that, according "to the information you gave the BLM, this facility has been in use since it was issued and you have been in ownership since 1988."  AR 44.  The decision added that "the right-of-way was reserved to the United States when patent was issued to Tom Bolack."  Id.  The decision therefore invited Bradshaw to apply for a new right-of-way on the same land by submitting filing fees, proof of ownership, back rental,

and other information.  The decision told Bradshaw that he could call the BLM if he had any

questions concerning the decision.  The decision did not state that it was a final order, or provide

Bradshaw with any information on how he could take an appeal.  Id.

Bradshaw then applied for a new right-of-way for the communications site.  On November

19, 1999, the BLM denied this request as well.  AR 585-97, 600-01.  The BLM identified three

reasons for the denial.  First, the BLM found that the NM 43307 right-of-way had expired upon

expiration of the FCC license (although the BLM revised the date it believed the FCC license had

expired to October 1, 1998).  AR 600.  Second, the BLM observed that rent and fees had never

been paid on the right-of-way, and that "this would serve as independent grounds for termination."

AR 600.  Finally, the BLM noted that it had never received formal notice of the transfer of NM

43307 from Whitney's bankruptcy estate to Pirkey, and that BLM regulations provide that "[n]o

assignment shall be recognized" unless it is approved in writing by an authorized officer.  AR

600-01 (quoting 43 C.F.R. 2803.6-3).  The BLM concluded that "[s]ince the R/W expired by it[s]

own terms on October 1, 1988, the R/W was no longer in existence."  AR 600.[2]  This decision

instructed Bradshaw that it could be appealed to the IBLA.  AR 601.

Bradshaw appealed the November 19, 1999, decision, and Bolack intervened in the

proceedings.  AR 3 n.1; AR 330.  On April 7, 2004, the IBLA reversed the BLM decision.  The

IBLA held that NM 43307 had never expired, concluding that under the governing law, the failure

---

[2]  In a later filing with the IBLA, the BLM would set out in detail its view that the land
patent had granted to Bolack the land underlying the right-of-way, and when the right-of-way
expired, it had "merged" into Bolack's dominant estate, leaving no right-of-way for the United
States to renew.  See AR 159-66.  The BLM would also explain in that brief that if the IBLA
determined the right-of-way still existed in the United States, the matter should be remanded to
the BLM "for termination of the right of way on the other valid grounds."  AR 164.

to submit proof of an FCC license or pay rent due on the right-of-way "did not result in an automatic termination," but instead required the BLM to "take action to terminate the right of way," something it never did.  AR 345.  The IBLA also held that the "right-of-way grant did not expire by reason of the failure to maintain a valid FCC license to operate," because the FCC had reported to the IBLA that the FCC license was valid from 1981 to at least May 2000 (the date of the report).  AR 345.  Finally, the IBLA interpreted the land patent to Bolack to reserve to the United States title to the land within the boundaries of the right-of-way, which includes the right to grant a new right-of-way to Bradshaw.  AR 346-351.  The IBLA remanded the case to the BLM "for action not inconsistent with this opinion."  AR 352.[3]

On May 6, 2004, Bolack brought this action against the Department of Interior seeking review of the IBLA decision under the APA.  The parties' cross-motions for summary judgment are fully briefed and ready for decision.

## STANDARD OF REVIEW

Under 5 U.S.C. § 706, a court reviewing the action of an agency "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id.  The court should abide by the agency's factual findings if they are "supported by substantial evidence" and affirm the agency's orders so

---

[3] The IBLA noted that the BLM "enjoys considerable discretion" regarding whether to issue the right-of-way to Bradshaw on remand, and then quoted from two prior IBLA decisions that suggested limits on the BLM's ability to transfer ownership and administration of public lands.  AR 350-52.

long as there is a rational connection between the facts found and the choice made.  See Midwest

ISO Transmission Owners v. FERC, 373 F.3d 1361, 1368 (D.C. Cir. 2004).  The agency's

decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v.

Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one."  Id. at 416.

When the court reviews an agency's interpretation of a statute, the court turns to the two-

step analysis outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467

U.S. 837 (1984).  The first step is determining whether Congress has spoken directly to the

"precise question at issue," for if it has, "the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress."  Id. at 842-43.  If, however, the statute is silent or

ambiguous on the specific issue, "the question for the court is whether the agency's answer is

based on a permissible construction of the statute."  Id. at 843 (emphasis supplied).  When the

agency's construction of a statute is challenged, its "interpretation need not be the best or most

natural one by grammatical or other standards . . . . Rather [it] need be only reasonable to warrant

deference."  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991) (citations omitted).

The Supreme Court has stated flatly that reviewing courts "must give substantial deference

to an agency's interpretation of its own regulations."  Thomas Jefferson Univ. v. Shalala, 512 U.S.

504, 512 (1994).  When courts review an agency's construction of its own regulation, "courts owe

great deference to the interpretation adopted by the agency and will uphold that interpretation if it

is reasonable and consistent with the regulation."  National Trust for Historic Preservation v.

Dole, 828 F.2d 776, 782 (D.C. Cir. 1987).  Only when an agency's interpretation of its own

regulation is "manifestly unreasonable" should the court decline to accept that interpretation.  See

Liberty Maritime Corp. v. United States, 928 F.2d 413, 419 (D.C. Cir. 1991); National Wildlife

Fed. v. Gorsuch, 693 F.2d 156, 174 (D.C. Cir. 1982).

In sum, judicial review of agency decisions involves a "delicate balance of thorough

record scrutiny and deference to agency expertise." American Lung Ass'n v. EPA, 134 F.3d 388,

392 (D.C. Cir. 1998).  This thorough record scrutiny serves the primary objective of judicial

review of agency decisions – ascertaining that the agency did not make an arbitrary or capricious

decision, or one that was not in accordance with the law.[4]

## ANALYSIS

The most effective way to address the relevant legal arguments and questions raised by

both parties is to evaluate plaintiff's principal arguments *seriatim*, addressing defendant's

arguments as appropriate.  Hence, all those arguments will be assessed through the framework of

plaintiff's challenges to the IBLA decision.

## I.    Administrative Finality

Plaintiff argues that the IBLA abused its discretion when it failed to accord administrative

finality to the first BLM decision.  Pl.'s Mem. Supp. Summ. J. ("Pl. Mem.") at 11-17.  Plaintiff

points out that the relevant regulations provide a party with thirty days to appeal a BLM decision

before it becomes final.  When Bradshaw failed to appeal the July 30, 1999, decision within thirty

days, plaintiff argues, the decision became final, and the IBLA was required to afford the decision

-- and in particular its finding that the right-of-way expired in 1983 -- preclusive effect.  Plaintiff

---

[4]  Bolack suggests that the Court should defer to the BLM instead of the IBLA because the IBLA is not the "line agency" responsible in the first instance for the development of federal land policy.  The law is clear, however, that "although we examine both the BLM's and the IBLA's decisions, the deferential standard of review is applied to the decision of the IBLA." Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1156 n.5 (10th Cir. 2004).

maintains that the failure to do so was arbitrary and capricious and should be reversed.

At the outset, it should be made clear precisely what plaintiff is and is not arguing here. Plaintiff does not claim that this Court must accept the BLM findings under principles of collateral estoppel; nor could it, because it is the IBLA decision that is the final agency decision under review by the Court.  See Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1156 n.5 (10th Cir. 2004) ("The IBLA issues the DOI's final and binding decision, not the BLM.").  Instead, plaintiff argues that it was arbitrary and capricious for the IBLA to decline to afford preclusive effect to the first BLM decision when it was reviewing the second.  This issue -- which more properly falls under the rubric of "administrative finality" than "collateral estoppel" -- concerns the extent to which an agency is obliged to honor principles of administrative finality, and the situations in which a court will force an agency to honor those principles.  The issue has not received much attention in the courts.

It is generally understood that an agency is not governed by a traditional or rigorous conception of preclusion as to its own prior decisions.  One court, in a case involving the preclusive effect an agency must afford a prior *district court* opinion, held that an agency has some "discretion" regarding collateral estoppel, although it does not have "a free-swinging, uncanalized discretion to apply it or not."  Kairys v. INS, 981 F.2d 937, 940 (7th Cir. 1993).  A scholar has proposed flatly that an "agency should not be precluded from relitigating factual questions, especially those involving expert judgment, because of a determination made in a different agency proceeding."  2 Charles H. Koch, Jr., Administrative Law and Practice § 5.72 (2d

ed. 1997).[5]

Consistent with these principles, the Ninth Circuit has held:

> Recognition of the IBLA's power to reconsider under the circumstances of this case is consistent with the fact that it has long been recognized that the Secretary of Interior has broad plenary powers over the disposition of public lands.  He has a continuing jurisdiction with respect to these lands until a patent issues, and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest.

Ideal Basic Industries, Inc. v. Morton, 542 F.2d 1364, 1367 (9th Cir. 1976).  However, it is far from clear that this general principle – which seems designed to allow an agency to countermand orders issued by subordinates when new evidence requires -- can extend so far as to allow an agency to reverse a final decision involving the very parties before it, in a setting resembling a judicial proceeding, in arguable contravention of agency regulations on finality, and where no argument is made that new evidence or another cause requires such a result.[6]

_____

[5]  There also exists the general principle that "[a]n administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified," but this rule seems to be directed at instances of rule-making several years apart -- that is, it is applied in situations akin to a setting where a court is not following its own precedent, rather than where a court is not following principles of preclusion.  State of Mich. v. Thomas, 805 F.2d 176, 183 (6th Cir. 1986); see also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (plurality opinion).

[6]  The IBLA has often acknowledged that "[a]s a general rule, the principle of administrative finality precludes reconsideration in a later case of matters resolved finally for the Department in an earlier appeal."  Mary Sanford, 129 IBLA 293, 298 (1994); Thermal Energy Co., 135 IBLA 291, 305 (1996); see also Melvin Helit v. Gold Fields Mining Corp., 113 IBLA 299, 308 (1990).  It has also cited favorably to Ideal Basic in several instances to reverse the orders of lower officials.  See Ben Cohen, 103 IBLA 316, 328 (1988); Pathfinder Mines Corp., 70 IBLA 264, 278-79 (1983); see generally Maurice Duval, 68 IBLA 1, 3 (1982) ("The United States, which holds its interest in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over privately owned pieces of property.").

Fortunately, this Court need not enter these murky waters today, because plaintiff has waived this issue by failing to raise it before the IBLA.  As important as questions of finality are to administrative proceedings, so too are principles of issue exhaustion and waiver.  It is an "established principle[] of administrative law" that "in most circumstances a reviewing court should not adjudicate issues not raised in the administrative proceeding below, so that the agency has an opportunity to consider and resolve the objections prior to judicial review, and the reviewing court has the benefit of a full record."  Hinson v. National Transp. Safety Bd., 57 F.3d 1144, 1149 (D.C. Cir. 1995);  see Salt Lake Comm. Action Program v. Shalala, 11 F.3d 1084, 1088 (D.C. Cir. 1993) ("We start from the well-settled premise that objections to agency proceedings must be presented to the agency 'in order to raise issues reviewable by the courts.'").  The Supreme Court recently confirmed that a requirement of "administrative issue exhaustion" is the "general rule."  Sims v. Apfel, 530 U.S. 103, 109 (2000).

Plaintiff acknowledges this rule, but claims that this case falls under an exception designed for situations where "an administrative proceeding is not adversarial."  Sims, 530 U.S. at 111.  But plaintiff has not convinced the Court that the IBLA proceeding is not adversarial within the meaning of Sims.  Sims found a lack of an adversarial proceeding where the Social Security proceedings in the case were governed by regulations stating that the administrative review process is "informal" and "nonadversary," 530 U.S. at 111 (quoting 20 CFR § 404.900(b)),  it was the "ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits," id., the government has "no representative before the ALJ," and a "large portion of Social Security claimants either have no representation at all or are represented by non-attorneys,"

id. at 112.[7]

Here, by contrast, plaintiff -- as well as Bradshaw and the BLM -- all appeared before the

IBLA, they were all represented by counsel, filed several briefs at various points during the

administrative appeal, including briefs that responded to the other parties' arguments, AR 173-91,

AR 375-93, AR 489-98, and they were given every opportunity to present arguments to the IBLA.

AR 341 n.13; 43 C.F.R. § 4.413.  Although plaintiff notes the absence of a formal hearing, he

does not explain how such a hearing would have any bearing on his ability to make the

administrative finality argument he now makes to this Court.  The IBLA proceedings therefore lie

on the opposite end of the spectrum from Sims.[8]

In fact, Sims advised that "[w]here the parties are expected to develop the issues in an

adversarial administrative proceeding, it seems to us that the rationale for requiring issue

exhaustion is at its greatest."  Id. at 108.  Sims cited a proceeding before the Department of Labor,

where the regulations require the parties taking an appeal to "lis[t] the specific issues to be

considered on appeal," as precisely the sort of proceeding it had in mind -- one where the parties

are required to determine the issues and therefore a court should "ensure against the bypassing of

that requirement by refusing to consider unexhausted issues."  Id. at 106 (quoting 20 C.F.R. §

802.211(a) (1999)).  Plaintiff cannot seriously argue here that the parties were not expected to

---

[7]  The portion of the opinion discussing the nature of the proceedings was joined by only a plurality of the Court.  See 530 U.S. at 104.

[8]  Plaintiff intimates that the proceeding before the IBLA lacked "procedural rigor" because there were "ex parte" communications, but that does not appear to be true.  The communications to which plaintiff points were between plaintiff and the BLM, and occurred prior to any proceeding before the IBLA.  E.g., AR 620-21, 631-35; see Pl.'s Repl. Def. Opp. ("Pl. Rep.") at 11.

press issues to the IBLA.  Indeed, the regulations governing appeals to the IBLA require the

litigants to come forward with a "statement of reasons" supporting an appeal, upon penalty of

summary dismissal, language similar to the regulation highlighted in Sims.  See 43 C.F.R. §§

4.412, 4.414.

This Court is unpersuaded that plaintiff lacked a full and fair opportunity to make his

administrative finality argument to the IBLA.  See Salt Lake Comm. Action Program, 11 F.3d at

1088 (finding waiver where "[w]e see no reason why [the private party] could not have argued to

the [agency] the simple proposition that a disallowance constitutes a "termination" within the

meaning of 42 U.S.C. § 9841(a)(3)").  Plaintiff acknowledges that he was aware of the appeal as

early as October 1, 1999 (even before the second BLM decision).  AR 183; see also AR 604

(Bolack's attorney served with a copy of Bradshaw's Notice of Appeal from the second BLM

decision on December 13, 1999).  Plaintiff was represented by able counsel before the IBLA

(albeit different counsel than before this Court), and he filed several lengthy briefs at different

points during the administrative appeal.  He could have made the argument in any of those briefs.[9]

The Court would have benefitted from the IBLA's analysis of these difficult finality issues,

particularly since the trend in the law seems to be to afford discretion (and perhaps even

deference) to the agency's approach.  Plaintiff does not claim that he was denied access to

materials during the administrative proceeding, or that there was some other concrete procedural

---

[9] Plaintiff was an intervenor before the IBLA, and was granted such status despite not
formally applying for it.  AR 03.  His participation in the IBLA proceedings appears to have been
extensive.  The fact that he is in the case as an intervenor does not in any way excuse his failure to
raise arguments before the agency.  See Idaho Watersheds Project v. Hahn, 307 F.3d 815, 835 (9th
Cir. 2002).

deficiency before the IBLA that impeded his ability to raise a legal argument to the IBLA.[10]
The Court declines to find that the IBLA abused it discretion in failing to consider a contention
that plaintiff did not even argue before it.  Therefore, the Court will not reach plaintiff's contention
that defendant was arbitrary and capricious in failing to afford finality to the first BLM decision.

## II.      Expiration of NM 43307 for Failure to Pay Rent

The BLM determined in its second opinion that NM 43307 automatically expired because
Whitney had failed to pay rental charges for the right-of-way.  The IBLA disagreed, relying on 43
C.F.R. § 2803.4(b) and (d), which provide:

> (b) The authorized officer may suspend or terminate a right-of-way grant or
> temporary use permit if he determines that the holder has failed to comply with
> applicable laws or regulations, or any terms, conditions or stipulations of the right-
> of-way grant or temporary use permit or has abandoned the right of way.
> . . .
> (d) Before suspending or terminating a right-of-way grant pursuant to paragraph (b)
> of this section, the authorized officer shall give the holder written notice that such
> action is contemplated and the grounds therefor and shall allow the holder a
> reasonable opportunity to cure such noncompliance.

43 C.F.R. § 2803.4.  The IBLA held that these regulations require the BLM to provide a right-of-
way holder with "written notice" of an intent to terminate due to breach of the terms of the right-
of-way and an "opportunity to cure," and then formally take the step of "suspending or
terminating" the right-of-way grant.  The IBLA claimed that no such notice was given, and no
formal act of termination was ever taken.  Bolack argues that this is an untenable reading of the
regulation, and that the IBLA misreads the January 25, 1985, letter that gave Whitney thirty days

---

[10] Plaintiff has mentioned at various points in his papers the fact that the government was
late in filing certain administrative records *in this Court*.  See Pl. Rep. at 11, 13.  Nevertheless,
plaintiff stated bluntly in his "Comments on Defendant's Notice" that plaintiff "does **not** claim to
have suffered any prejudice by reason of the belated filing . . . and . . . does **not** oppose the filing."
Pl.'s Comments at 1 (emphasis in original).

notice of his failure to pay.

The Court concludes that the IBLA's view of the regulation and the record is entirely "reasonable and consistent with the regulation" and therefore should be upheld.  National Trust for Historic Preservation v. Dole, 828 F.2d 776, 782 (D.C. Cir. 1987).  The IBLA's interpretation of the regulation is drawn directly from the regulatory text.  The interpretation is also consistent with the IBLA's reading of these provisions in earlier cases.  See, e.g., Creole Corp., 146 IBLA 107, 115 (1998); Laguna Gatuna, Inc., 131 IBLA 169, 172 (1994).  Reading the regulation to require that the BLM provide notice and undertake a formal action to effect a right-of-way termination advances several laudable goals, among them eliminating uncertainty regarding the status of rights to land and ensuring that citizens are provided with notice before they lose a valuable property right.

The BLM sent Whitney two letters regarding his failure to pay assessed rent on the right-of-way.  In the first letter, dated October 15, 1984, the BLM informed Whitney of the rental and administrative charges due since inception of the right-of-way, and offered him payment options.  AR 694.  In the second letter, dated January 25, 1985, Whitney was informed that rental payments and administrative charges were due within thirty days of receipt, and that if payment was not received within thirty days, the "account [would] be referred to [BLM's] Solicitor for legal action."  AR 41.  Nowhere in either letter was Whitney given notice that the BLM contemplated terminating his right-of-way.  Nor, by extension, was he given time to cure.  Finally, Bolack does not point the Court to any evidence in the record that the BLM ever took the formal step of terminating the right-of-way.  Accordingly, the Court concludes that the IBLA's determination that the right-of-way did not expire for reason of failure to pay rent was not arbitrary and capricious,

-16-

and should be upheld.

### III.   Whitney's Failure to Submit a Valid FCC License to the BLM

The BLM held in its first decision that NM 43307 was no longer in effect because Whitney

had failed to comply with the language in the right-of-way requiring him to submit a current FCC

license within 90 days of the right-of-way grant.  AR 43.  The IBLA addressed this argument in its

decision, concluding that the right-of-way grant did not "provide for automatic termination for the

failure to present the license [with]in 90 days."  AR 344.  Plaintiff suggests that this finding is

incorrect, although he does not specifically explain why.[11]

The Court need not devote much discussion to this point.  Paragraph 12 of the right-of-

way grant provides that "[t]he right-of-way herein granted is conditioned upon the presentation of

the license granted by the Federal Communications Commission for the installation."  AR 193.

Paragraph 13 provides that "[t]his right-of-way will be terminated in its entirety upon written

notice from this office to the grantee[,] or its successor or assigns, if there has been failure to file

the required FCC license within 90 days from date of this grant."  Id. (emphasis added).  This

language is clear -- termination of the right-of-way will occur only after written notice.

The IBLA correctly found that the June 26, 1984 letter from BLM to Whitney, stating that

evidence of an FCC license "must be submitted to the above address within 30 days . . . or action

will be taken to terminate the right-of-way," did not "constitute an exercise of BLM's right to

terminate the grant on this basis," but was instead "nothing more than a demand in contemplation

of a future decision declaring the grant terminated if Whitney did not comply."  AR 344.  No such

---

[11]  Plaintiff focuses his attention instead on the IBLA's separate conclusion that the FCC license was in effect from 1981 to 2000, which is addressed infra.

future decision was made.  In fact, as the IBLA noted, the record shows that Whitney provided the

necessary notice within thirty days.  AR 43, 344.  The Court therefore finds that the IBLA did not

err in its interpretation of paragraphs 12 and 13 of the right-of-way grant.

## IV.   Expiration of the Right-of-Way Because of Lapse of FCC License

Plaintiff also contends that the IBLA's findings that the FCC license never expired, and as

a consequence the right-of-way never expired, was not supported by substantial evidence.  Pl.

Mem. at 18-21.  The IBLA relied on an affidavit from the FCC stating that "radio station

KDAG(FM) formerly KRAZ(FM) . . . ha[d] been licensed and authorized to operate from 1981 to

the present."  AR 529.  Plaintiff notes that this statement only references the stations by their call

letters, not by the location of their broadcast facilities.  Pl. Mem. at 19.  Plaintiff argues that the

grant of the communications site right-of-way intended it to stay in effect only for so long as there

was a valid FCC license *at that communications site*.  Drawing on various portions of the

administrative record, plaintiff attempts to weave together a factual showing that the radio station

and therefore the FCC license moved from the right-of-way and began broadcasting at a different

site.  Pl. Mem. at 21; compare AR 544 with AR 547, 550, 561.

This is not an implausible argument.[12]  However, once again, plaintiff failed to raise it

before the agency below, and the argument is therefore waived.  This situation presents a

paradigmatic case for exhaustion:  Bolack could have made a fact-intensive argument to the

agency with the most familiarity with the record and the greatest experience with similar language

---

[12]  Although the right-of-way grant does not expressly require that there be a valid FCC
license for operation at the site, even the IBLA hinted that this might be the correct reading of the
grant.  AR 345 n.16 (noting in passing that the crucial issue in determining whether the right-of-
way expired was "the existence of a valid license for the site").

in right-of-way grants, but instead has waited to search through the administrative record, piecing together a colorable argument for the first time on review.  The IBLA should have had the opportunity in the first instance to make findings on the information that plaintiff identifies in the record, to hear arguments on the meaning of the information and request additional evidence if necessary, and to provide its expert views on the reading of the underlying right-of-way.  Plaintiff did not provide the IBLA this opportunity.  See Sprint Communications Co., L.P. v. FCC, 76 F.3d 1221, 1228 (D.C. Cir. 1996) (court's role is "to review the agency's handling of the objections put before it, not to provide a forum for new arguments based upon different facts that the petitioner could have but did not bring out below").

Plaintiff insists that he preserved the issue below.  Pl. Rep. at 7-11.  In the proceedings before the IBLA, plaintiff stated that "no documents nor evidence have been presented in this appeal that Bradshaw is or has been the holder or owner of the license authorized to operate a commercial FM broadcast station on NM 43307."  AR 391 (Bolack's Resp. to Bradshaw's Rep. Br.).  Bolack made this statement as part of his argument that Bradshaw was not the real party in interest to the proceedings below, and that Bradshaw had "no standing to assert the validity or the termination of NM 43307" because Bradshaw was not the holder or owner of the relevant FCC license.  AR 391.  The issue of whether Bradshaw had standing to pursue an appeal before the IBLA is analytically distinct from whether, as a matter of fact, the FCC license for KRAZ/KDAG authorized operation from a particular broadcasting site, and whether, as a matter of law, the terms of the right-of-way grant required such a nexus.

Plaintiff also argues that he was under no obligation to "anticipate every possible stupid mistake that IBLA might make," Pl. Rep. at 8, as if to shift the burden of advancing arguments

from himself as an involved party onto the administrative law judge reviewing the record. To

permit plaintiff to advance this new argument now would be "to provide a forum for new

arguments based upon different facts that the petitioner could have but did not bring out below,"

which is precisely the sort of argument that the D.C. Circuit condemned in Sprint Comms., 73

F.3d at 1228. As plaintiff indicates, "the evidence was already in the Administrative Record." Pl.

Rep. at 8. One must ask why, then, plaintiff did not cite this evidence and develop this argument

below. It is too late for him to attempt to do so now.

## V.    Expiration of the Right-of-Way Because of Assignment

Plaintiff suggests that the IBLA failed to address the BLM's holding that the right-of-way

expired because no notice was provided of the assignment from the bankruptcy estate to Homer

Pirkey (or to any of the other parties who used the right-of-way). Pl. Mem. at 24-25. However,

the IBLA did address this issue in footnote 20 of its opinion. There, the IBLA explained that it is

not entirely clear that the Bankruptcy Court purported to convey the right-of-way, and at any rate,

the "record contains no approved assignments." Because the regulations require that any proposed

assignment be filed with the BLM, "to the extent any may have been attempted, they need not be

recognized by BLM." AR 350. The IBLA also noted at the end of its opinion that it rejects all

other arguments made by the parties. 161 IBLA 116, 134.

All of this suffices to address the issue. There is simply no basis in the regulation or

elsewhere to suggest that a failure to provide notice of an assignment of a right-of-way leads to

termination of the right-of-way itself. Rather, as the IBLA indicated, the assignment simply is not

recognized. This is plain from the text of the regulation, and indeed, plaintiff cannot even bring

himself to defend the argument that the right-of-way might have expired on this ground. Plaintiff

argues instead that the IBLA erred by not considering the issue.  However, an "agency need not address every conceivable issue or alternative, no matter how remote or insignificant."  <u>Center for Auto Safety v. Peck</u>, 751 F.2d 1336, 1356 (D.C. Cir. 1985).  Therefore, the Court rejects plaintiff's contention that the IBLA acted in an arbitrary or capricious manner on this subject.

**VI.     The Patent Language**

Plaintiff contends that the IBLA misconstrued the governing statutes and regulations when it held that the land patent to Bolack reserved in the United States title to the land encompassed by right-of-way NM43307.  This argument, although close, is ultimately not persuasive.

The land patent provides that Bolack would receive title to the land described in the patent "excepting and reserving to the United States . . . 4.  Those rights-of-way and easements that have been granted and which are of record as follows . . . NM43307."  AR 37-38.  The IBLA explained that the word "excepting" in a deed "withdraws from the description of the property conveyed the excepted property," and that a "reservation" is a "conveyance of the grantor's entire interest in property by which an interest that did not previously exist as an independent right or interest is simultaneously created and vested in the grantor."  AR 348-49.  The IBLA concluded that placing the terms together suggested a desire to withdraw from the description of what is conveyed in the land patent "an independent right to an interest in the land" that is "created and vested in the grantor."  AR 349.  The IBLA noted that a grantor usually communicates that a conveyance of land is burdened by a right-of-way through use of the phrase "subject to".  Not only did the patent not refer to the disposition of the right-of-way with the words "subject to," but it used "subject to" language elsewhere in the patent.  AR 348-49.

The treatment the IBLA has given the land patent is consistent with both the statute and

-21-

the implementing regulation.  The statute provides that if and when an agency decides to transfer

out of Federal ownership any lands covered in whole or in part by a right-of-way,

> if the Secretary concerned determines that retention of Federal control over the
> right-of-way is necessary to assure that the purposes of this subchapter will be
> carried out, the terms and conditions of the right-of-way complied with, or the
> lands protected, he shall (a) reserve to the United States that portion of the lands
> which lies within the boundaries of the right-of-way, or (b) convey the lands,
> including that portion within the boundaries of the right-of-way, subject to the
> right-of-way and reserving to the United States the right to enforce all or any of
> the terms and conditions of the right-of-way, including the right to renew it or
> extend it upon its termination and to collect rents.

43 U.S.C. § 1768.  The regulation provides that:

> Where a right-of-way grant or temporary use permit traverses public lands that are
> transferred out of Federal ownership, the transfer of the land shall, at the discretion
> of the authorized officer, include an assignment of the right-of-way, be made
> subject to the right-of-way, or the United States may reserve unto itself the land
> encumbered by the right-of-way.

43 C.F.R. § 2803.5(b).  These provisions contemplate that the United States "may reserve unto

itself the land encumbered by the right-of-way," and appear to anticipate that a conveyance of land

burdened by a right-of-way will use "subject to" language.  That is what the IBLA held in this

case.  Plaintiff does not even identify the aspect of the statute or the regulation that he believes is

inconsistent with the IBLA's reading of the statute.

Plaintiff's real issue does not seem to be with the IBLA's compliance with the statute or the

regulation, but with IBLA's interpretation of the language in the land patent itself.  Fairly read, the

patent is ambiguous.  The IBLA is correct that one would have expected the patent to use "subject

to" language, that its reading is consistent with the common usage of the terms "excepting" and

"reserving", and that the statute and the regulation arguably contemplate the United States

reserving to itself land encumbered by the right-of-way when it uses language similar to that

employed in this case.  But plaintiff is correct when he suggests that the patent meant what it said

when it refers to "excepting and reserving" the "rights-of-way" rather than the land encompassed

by the rights-of-way.  The Court does not believe that the IBLA's reading of the patent is the only

permissible interpretation, or even perhaps the best interpretation, but the Court also cannot say

that it is an unreasonable interpretation.

The D.C. Circuit has held that courts should defer to an agency's reasonable construction

of the terms of a contract, settlement agreement, or other document that creates legal rights.  See

A/S Ivarans Rederi v. United States, 938 F.2d 1365, 1368 (D.C. Cir. 1991) ("Once we determine

that a filed contract is silent or ambiguous on a particular question, we must defer to the agency's

reasonable construction of the contract's terms."); National Fuel Gas Supply Corp. v FERC, 811

F.2d 1563, 1568-73 (D.C. Cir. 1991) (holding that courts should "defer to an agency's reading of a

settlement agreement").  This principle applies not only to contracts involving issues within the

agency's area of expertise, see Southern Co. Servs., Inc. v. FERC, 353 F.3d 29 (D.C. Cir. 2003),

but also "where the issue simply involves the proper construction of language," on the theory that

"the agency's interpretation typically will be enhanced by technical knowledge" of "industry

conditions or practices" as well as "its more comprehensive experience with the kinds of disputes

and negotiations that generally produce such an agreement."  National Fuel Gas Supply, 811 F.2d

at 1568 (quoting Columbia Gas Transmission Corp. v. FPC, 530 F.2d 1056, 1059 (D.C. Cir.

1976)).

Deference is appropriate even when the agency is a party to the agreement.  Thus, the D.C.

Circuit has found that a settlement agreement negotiated between the agency's staff and a private

party was entitled to deference from the courts.  See Cajun Elec. Power Cooperative v. FERC, 924

F.2d 1132, 1135 (D.C. Cir. 1991) ("[T]he agency to which Congress entrusted the protection and

discharge of the public interest is entitled to just as much benefit of the doubt in interpreting such

an agreement as it would in interpreting its own orders.").  For similar reasons, a different court

afforded "great respect" to the Postal Service's interpretation of a lease agreement between the

Postal Service and its lessor.  See Alvin, Ltd. v. United States Postal Service, 816 F.2d 1562, 1564

(Fed. Cir. 1987).

        This Court concludes that the IBLA's interpretation of the land patent falls well within the

sphere of deference recognized by these cases.  The IBLA is delegated complete authority to

address the disposition of our national lands.  See IMC Kalium Carlsbad, Inc. v. Interior Bd. of

Land Appeals, 206 F.3d 1003, 1009 (10th Cir. 2000) (IBLA is "delegated responsibility to decide

for the Department 'as fully and finally as might the Secretary' appeals regarding use and

disposition of the public lands and their resources" (quoting National Wildlife Fed'n, 145 I.B.L.A.

348, 362 (1998)); Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 500 (9th Cir. 1980) ("IBLA

decides the correctness of Department of Interior decisions relating to the use and disposition of

public land.").

        The IBLA adjudicates land patent disputes on a regular basis, and it can be expected to

possess an expert's understanding of the meaning of the technical and often archaic language in

land patents, the alternative language that was available to the drafters, and the various issues that

the language in the patent was designed to address.  See National Fuel Gas Supply, 811 F.2d at

1568.  Deference to the IBLA's reasonable interpretation of the ambiguous terms in land patents

also enables it to fashion in the first instance a consistent set of rules to govern the legal

documents at the very center of its delegated role as the overseer of the disposition of federal

lands.[13]  Under these circumstances, and given the strong body of jurisprudence cited above, the

Court concludes that deference to the IBLA's reasonable reading of the ambiguous patent

language is appropriate here.  See Kansas Cities v. FERC, 723 F.2d 82, 87 (D.C. Cir. 1983)

("[W]e would be foolish not to accord great weight to the judgment of the expert agency that deals

with agreements of this sort on a daily basis."); Washington Urban League v. FERC, 886 F.2d

1381, 1386 (3d Cir.1989) ("We generally defer to an agency's interpretation of agreements within

the scope of the agency's expertise and the case for deference is particularly strong when the

agency has interpreted regulatory terms regarding which it must often apply its expertise.").[14]

## VII.   Discussion at the Close of the IBLA Opinion

Finally, plaintiff argues that the IBLA acted in an arbitrary and capricious manner when, at

the conclusion of its opinion, it discussed two of its recent decisions that caution against the

transfer of government lands.  This argument is without merit.  The discussion plaintiff references

appears to be a response to the BLM's suggestion in a filing to the IBLA that, were the IBLA to

conclude that the NM 43307 right-of-way still exists, the BLM would on remand simply terminate

---

[13]  Indeed, the IBLA even cited one of its own recent decisions for its interpretation of the wording in the land patent in this case.  AR 349.

[14]  It should be mentioned that, even if the IBLA's interpretation of the patent language is incorrect, Bolack's contention that the right-of-way merged with his fee simple estate when it expired would still be wrong.  If the United States did not reserve fee simple in the land "which lies within the boundaries of the right-of-way," then it certainly conveyed the lands "subject to the right-of-way and reserving to the United States the right to enforce all or any of the terms and conditions of the right-of-way, including the right to renew it or extend it upon its termination and to collect rents."  AR 350.  The United States, even if it does not own title to the land underlying the right-of-way, would still retain the right to "renew" or "extend" the right-of-way to Bradshaw. As the IBLA correctly explained in its decision, the right-of-way does not "merge" with the underlying estate in a situation  where the holder of the estate has not been assigned the right-of-way.  AR 349-350 n.19; Cole Industries Inc., 82 IBLA at 292.

the right-of-way, or in the alternative "formally relinquish any interest it may have" in favor of

Bolack.  AR 164.  It goes without saying that it is well within the IBLA's authority to advise the

BLM on its view of the relevant and governing law, and it is better for all involved that the advice

come before the BLM issues an erroneous decision rather than after.  See IMC Kalium Carlsbad,

206 F.3d at 1009 ("[t]he IBLA has de novo review authority over BLM decisions.").  The IBLA

decision therefore cannot be reversed on this ground either.

## CONCLUSION

For all the reasons stated above, defendant's motion for summary judgment is granted, and

plaintiff's cross-motion for summary judgment is denied.  Judgment is entered in favor of

defendant.  A separate opinion will issue herewith.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:    March 31, 2005

Copies to:

William Francis Demarest
Blackwell Sanders Peper Martin
1737 H Street, NW
Suite 300
Washington, DC 20006-3956
(202) 378-2310
Fax: (202) 378-2319
Email: wdemarest@blackwellsanders.com

Peter S. Smith
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530
(202) 307-0372
Fax: (202) 514-8780
Email: peter.smith@usdoj.gov